Ms. Miller, you're retained, correct? I'm sorry? You're retained. Yes, well, I'm in pro bono. Okay, well, we thank you for taking the pro bono case. I just wanted to make sure we had not appointed you. Okay, thank you. 133112, Terry Wilkins et al. versus the Humane Society of the United States, intervener, David Daniels in his official capacity as director of the Ohio Department of Agriculture et al. Oral argument as follows, 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants, and the defendant intervener. Mr. Owens for the plaintiffs' appellant. Good morning. Robert Owens on behalf of the multiple plaintiffs in this case that are appellants. Good morning, and I thank you for listening to our case and reviewing our briefs. I also thank previous counsel. This is my first appearance before this body, and it is always nice to see somebody go first to break the ice, so thank you very much. Let me start my presentation, and first of all, I should say I've asked to reserve the bulk of my time for rebuttal in this case. Let me start. You mean you're going to take whatever you take and then whatever is left you want to use? What I've asked to do is reserve 10 minutes of my time for rebuttal, Your Honor. Thank you. Let me start with first a roadmap. I'd like to begin by starting to look at some of the broader concepts of law that I think drive the issues in this case, then take a look more closely at some of the key pivot points which are subject to your de novo review. First of all, with regard to some of the broader concepts in this case, I think a review of the opinion of the lower court's decision is telling for a few reasons. First of all, you can see that the district court judge is really struggling with what I think are very ugly facts and the application of very ugly facts to the situation. I think that is very evident throughout the opinion, certainly in the beginning, and I think the court even makes special provision to talk about it. To a degree, it makes sense. Sitting behind me are two young ladies that are having their entire birthright dispossessed. There are families that are being destroyed. There are animals that are literally, because of their age, because of their condition, and being subject to a process of pit tagging that requires anesthesia. They are literally subject to a death sentence as a result of that. There was veterinary medical testimony to testify by that, by a veterinary that examined some of the specific animals that are taking place. I think when we look at that particular issue, that helps set the framework for how we contemplate this de novo review of facts. You know, I understand this powerful statement that you just made about the death sentence of these animals, but this statute has an unusually large number of exceptions. It seems that if you look at the breadth of those exceptions and the number of the exceptions, your client's livelihood can hardly be said to be taken away because there are a number of exceptions that would allow them to continue their activities, even within the parameters of the statute. In order to specifically address that point, because I think that was sort of a key crux of where the district court was sort of reviewing, hey, what about all these exceptions? And of course, in the appellee's brief, they say, well, hey, what about all these exceptions? Now, there are exceptions and there are a number of them, but your honor, they have absolutely no application whatsoever to private ownership free enterprise. And there was some specific testimony, and I think we cite that in our brief, that, look, if you want to be somebody that privately owns animals and you want to be somebody that uses that property to generate a private free enterprise, there's really only two exceptions, or really only two options that you have under this law that apply. And that's either membership in the ZAA or AZA or the essentially permitting scheme that the state has put together. Now, I recognize there are other options out there. For example, you can be a research facility, you can be a circus. None of those will ever apply to my clients. Is this statute, well, do you contest that this statute is a valid exercise of the court's regulatory authority? Because they have to balance a number of things related to these wild, sometimes dangerous animals and public safety. Are you challenging that it's a valid exercise of the authority? I mean, for the aspect of the sort of regulatory taking part, we're saying it's a facial challenge in that regard. Now, with regard to the First Amendment aspect, I'm saying from a First Amendment perspective, this whole scheme fails. And it fails for this reason principally, and that is that essentially what we're doing here is we're giving these owners, and understand, we're talking about property that has been legal to own since the inception of the state of Ohio and has never been illegal to own. It is now made illegal, and you only have two options to stay lawful. One is the membership in the AZA and ZAA, and the other is the permitting scheme. And so what we've said in our brief is that, A, the permitting scheme is essentially Hobson's choice. It's really no choice at all because they set the standard. In this sentence, as quickly as possible, because your time is up and you'll have your rebuttal time. Okay, very good. Essentially, the point is this, that because the permitting scheme sets standards so ridiculously high, and we cite what those are in the brief, that essentially it wipes out that as an option altogether and really leaves AZA, ZAA as the only option. And there, as we've stated in our brief, is that forced, compelled association that is violative of the First Amendment. So I think it never passes muster. Thank you, and I'll discuss it. I need to know, I would assume you're Mr. Murphy, and how are you all going to divide your time? Twelve minutes for me, Your Honor, and three minutes for counsel for the Humane Society of the United States, Anna Frostick. Thank you, Your Honor. The Ohio Dangerous Wild Animals and Restricted Snakes Act was the result of an October 2011 tragedy in which an animal owner released 50 of his wild animals before committing suicide. The act reasonably seeks to promote the animal health and public safety concerns inherent in the ownership of dangerous wild animals while giving reasonable options for current owners to maintain their animals. Whatever one's view of the act as a policy matter, it passes constitutional muster. First, the act's exemptions for accredited facilities under the AZA and the ZAA do not compel anyone to join those organizations. It's simply one option among many, as you yourself said, Judge Donald. And second, the microchipping requirement is not a permanent physical occupation of property within the meaning of the Supreme Court's Loretto decision because it's not third-party required access, which was the key factor in Loretto. It's analogous to a license plate on a car or a sprinkler system requirement or a fire extinguisher requirement in a building. It's not quite like that. I mean, Mr. Owens says it's a death sentence because there's an invasion of the animal in order to place the microchip. That's an overstatement of the record. It's not a matter of putting a tag on it. That's true. Just putting a little sign on the animal. It's more than that. That's true. I don't want you to disagree. But it's the state of the art. Our experts testified that it's the state of the art. Our veterinarian experts testified that it's the state of the art. It can be done fairly safely and humanely. It can be done safely and humanely. It's done on dogs and cats all the time. You don't even need to anesthetize dogs and cats. The reason you anesthetize is because they're dangerous wild animals and so you can't get near them. Our experts, the state's experts, also testified that anesthesia is very rarely contraindicated. Dr. Yungi at the Columbus Zoo and Aquarium suggested that the zoo anesthetizes old animals all the time. He mentioned Kolo, which is a famous gorilla at the Columbus Zoo who's the first born in captivity and she's still alive at the zoo. Setting it aside, permanent physical occupation has always required third party access. It's just a requirement on the use of property. It's not a requirement to give the property to some other person to allow the person to have the animal for some time. It shouldn't be analyzed under the permanent physical occupation per se taking rubric. If anything, it should be analyzed under the regulatory taking, but their brief expressly waives any type of regular taking here and actually goes so far as to criticize the district court in engaging in regulatory taking analysis. That essentially, I think, dooms their claim because it would be a fairly unprecedented ground to say that this is a permanent physical occupation within the meaning of the RATO. Now getting back to the First Amendment issue, the First Amendment claim fails for two distinct reasons. First, they failed to prove compulsion. And number two, even if they did prove compulsion, the type of association at issue here fits neatly within the Supreme Court's prior cases in Keller and Abood. So I'd like to start with the compulsion aspects. As you indicated, Judge Donald, there's plenty of options available to keep your animal. And so it's not like the cases where the court, it's not like the unconstitutional conditions cases where you have to join the state bar to become a lawyer or join a union to get a public job. It's not a quid pro quo like that. It's just one option among many. Now they're claiming that it's factually compelled to them because they don't want to engage in any of the other exemptions. But I know of no case that has found that type of factual compulsion to be sufficient to trigger First Amendment type freedom of association rights. And even if it did, even assuming it did trigger some type of freedom of association rights here, I still don't think they've actually made out that there's compulsion because all of the witnesses, well five of the witnesses testified in this case that they couldn't meet the standards of the AZA or the ZAA either. So in fact, nobody testified that they could meet these standards. And so they're essentially saying that they're being compelled to do something that they can't do. So that's a unique type of compulsion claim. I think at the end of the day, that just dates back to them suggesting that they can't meet any of these options. So moving on, so that's the compulsion aspect. Moving on to the, even assuming there was some type of compulsion here, the Supreme Court's decisions in Keller and Abood suggest that mandatory associations can, in some circumstances, be perfectly acceptable if it's non-speech related. So in Keller it was you have to join the bar because the bar is engaged in regulatory activity over lawyers. It's the same analogy here. The AZA and the ZAA are not, at their core, advocacy organizations. They're essentially accreditation agencies. They set standards of care for how big cages should be or whatnot for animal care. So the analogy to those cases is directly on point. But those cases, of course, there was actual compulsion there and there's not compulsion here, and that's the easiest way to decide this case. But they suggest that these entities are actually engaged in some type of ideological activity, but the only evidence they pointed to was the entity's support of this bill. And that is simply insufficient on the evidence to show that any of their fees would actually, if they joined these organizations, be spent on any of that type of ideology. Moreover, the court's decision in Keller suggested that you couldn't spend fees on stuff that was completely unrelated to the law. So the state bar in that case was engaged in ideology activity, such as gun control legislation and pollution regulation, which had nothing to do with the regulation of the state bar. Here, the activity at issue has everything to do with animal welfare. So unless the court has any other questions, I'll reserve the remainder of my time to my Defendant's Counsel for Intervenor Defendants. Good morning, Your Honors. May it please the Court, my name is Anna Frostick. I'm Counsel for Defendant Intervenor Appellees to the Humane Society of the United States. I don't want to belabor any of the points that my colleague made, but I would just summarize our position in this case, if I may. Like many other state laws in this country, the Dangerous Wild Animals and Restricted Snakes Act is an eminently reasonable regulation of inherently dangerous activity. The act does not compel any speech or association, nor does it require subsidization of political speech or unconstitutionally condition a government benefit. As the Supreme Court stated in Rumsfeld, plaintiffs' claims are a far cry from the traditional compelled speech jurisprudence, and their arguments trivialize the freedoms protected by the First Amendment. Plaintiffs have, as my co-counsel said, waived their regulatory takings argument on appeal. They have focused entirely on an argument that the microchipping requirement is a physical invasion of their private property. That claim fails as a matter of law. In the Tahoe Sierra Preservation Council case, the Supreme Court specifically said that physical takings are relatively rare and easily identified. That is simply just not the case here. There's no need for this court to deviate from its own precedent in the Tennessee Scrap Recyclers case, which upheld a law that required a tag-and-hold procedure for personal property. That is not analogous to the pit tag provision that plaintiffs claim is unconstitutional. The pit tag is even less invasive than the tag-and-hold in Tennessee Scrap Recyclers. Neither the government in this case, nor a third party authorized by the government, is provided access to plaintiffs' property by virtue of the microchip requirement, nor are plaintiffs deprived of their right to exclude others from their property. In this case, there is simply no violation of the First Amendment, nor any violation of the takings claim. We have a set of plaintiffs who simply do not want to comply with regulations that were the process of a long and reasoned legislative process that they were part of, and we would respectfully request this court to uphold the district court's decision. I'm happy to answer any questions that you might have. Thank you. Let me ask this. Are there similar statutes in other states now, or is this unique because of the unique problem that arose in Ohio? Thank you for your question. This is not a unique law at all. In fact, Ohio is one of the last states to adopt a law like this. Currently, we think there are only a handful of states that do not have a similar law. I'm happy to provide a supplemental briefing on all of those state laws, but essentially almost all states in this country currently have laws on the books that directly regulate the possession of dangerous wild animals, big cats, bears, primates, et cetera, and that provide a series of options for prior owners to maintain their property after the passage of those laws. A lot of those state laws are, in fact, far more restrictive than Ohio's law. I would say that Ohio's law is somewhere in the middle of that spectrum. Many states only exempt AZA and do not exempt ZAA, and so there are numerous states that have laws that are more restrictive, and this is a common law that we're seeing across the country. Thank you, counsel. Thank you. Thank you again. Now let me, I guess, begin my rebuttal by talking about specifically this illusion of choice that is brought up and I think is pivotal to the First Amendment claim on the association part of it. You know, when I think about this illusion of choice, it reminds me of how the federal court approached issues in the civil rights era when there were these doctrines of separate but equal, and the court looked at this and said, hey, you can claim that there's a choice and you can claim that there's separate schools and that they're equal, but we all know that that's just absolutely not true, and they eventually got to the point of saying we're not going to accept that standard, and I think this applies as well. When you look at the de facto. It took almost 100 years to get there, didn't it? I'm sorry, what did you say? It took almost 100 years to get there, didn't it? And, Your Honor, it did, and what I would say is let's not go backwards at this point, you know, on that issue. When we have a position like this where the court can take a look at this and any sort of a smell test realizes that from a de facto standpoint, there's no choice at all. And even having said that, this analogy just sort of escapes me, but carry on. Thank you, Your Honor. The point here is that when we're dealing with this illusion of choice, that's what gets us to this forced association because I think the record is clear that there were plaintiffs that could choose to essentially join AZA and could meet those standards if they so choose, but there was testimony that they find them politically repugnant and abhorrent to them to be essentially, you know, in the issue of animal rights and animal husbandry, they have, in many cases, polar opposite views on what are best practices for those kinds of things. And that's why we have this issue of First Amendment because we're forcing people to say, look, if you can't afford to go through the state scheme, which is set up specifically, and there was testimony on it, that that regulatory scheme is set up specifically to destroy and wipe these people out. Can I ask a question about this joining versus accreditation? The statute provides that one exemption is that you can be accredited by the AZA or the ZAA, right? That's correct. Are those entities, do you have to join them to be accredited by them? That's correct, Your Honor. You have to join and then as a member you go through an accreditation process. And what's important... Can you be a non-accredited member? You can be a non-accredited member and still be a member and pay dues. There was testimony at the trial court that there's essentially sort of an entry level... You can't be accredited by them if you are not a member? That's correct. Okay. That's correct. You can be a member and not accredited, but you cannot be accredited and not a member is how that process works. And, again, what we're saying here is that because the standards for AZA and ZAA, and I think probably one of the things that jumps out at you deals with hyenas in particular, if you're a ZAA member, 600 square feet is all you need. But if you go through the regulatory scheme, all of a sudden it's 5,000 square feet, right? So we're not talking about issues related to, hey, it's the cleanliness, are they feeding them right, or what's the health care? It's got nothing to do with any of that. We're talking about 600 square feet, which is fine for hyenas if you're an AZA, ZAA member. But if you're not, then you have to have 5,000 square feet. And that's but one of numerous examples that we've briefed in a replete in the record that go to it. Wait a minute. The 5,000, wasn't that a preliminary proposal? Your Honor, it was. But that's not the requirement of the final regulation. The final regulation requires 400, doesn't it? No, Your Honor. All right. And they've switched them up, and I believe we have it in the briefing. I want to say it was reduced, but it's still 200, 300% larger. And then there's other things that have gone up and down and all over the place. You don't need to check it now, but you might want to. I mean, the information I had was that it was 400 for the hyenas in the final version, but that could be wrong. At the time that we had But in any event, it is incorrect to throw the 5,000 figure out there. At the time of trial, the 5,000 was the number. And I want to say it's still much higher than the AZA. And even if that one, if I'm incorrect on that one, the record is replete with many other examples. And I think we've even cited several specifically in our reply brief, in which the standards for the AZA, ZAA are, just from a physical description, much less significant than the standards that you need to have through the regulatory scheme. And that, I think, is where it really comes into showing that this is Hobson's choice. Because if it wasn't, what they could just say is, hey, it's the standards that these boards have, or the same standards that ZAA, AZA has. But that's not what the situation is. Special interest has carved themselves a niche, and as a result of creating that niche, what they've done is they've created a First Amendment problem in the process. And I think that that's where that comes in. Let me talk about, too, this physical occupation. Because I think that Your Honor brings up a good point with regard to this physical occupation. This is very unsimilar to the cats and dogs case. And I think there's been significant testimony about the fact that with cats and dogs, you virtually never have to have a nest, you know, vets and anesthesia and all that kind of stuff. Whereas with these animals, that's pretty much all that you're talking about is having to use that process. And it was the defendant's own witness that said that, yeah, you have to anesthetize them. And it was the defendant's own expert witness that said, no, especially with regard to older animals, you would never anesthetize them just for the purpose of doing this pit tag. Now, if they had some other disease or some other malady, and we were going to sort of work out them because it was medical necessary, then you'd anesthetize them for that, and you could pit tag them while they were down. But you certainly wouldn't do that with older animals. And the evidence that was deduced at this trial was that there were several animals that were reviewed by a medical veterinary that gave testimony that was unrefuted that it would be malpractice for a veterinary to anesthetize that animal for the purpose of a pit tag because it would be far too dangerous for that process. Now, if they were facing a life-threatening illness already, fine, you anesthetize them because they're already facing a life-threatening illness. But for the purpose of a pit tag, no, you would never do that. And even the defendant's own witness agreed with that. And I think when we talk about that pit tag, they make this argument that, hey, that's really not an invasion of privacy. But again, in our briefs, we talked about the bundle of rights that comes with ownership. And clearly what we see in this pit tag where the state chooses the nature of the pit tag, the state chooses where and when it goes in, the state chooses and says, by law, if you ever remove it, that's a crime, and the state has access to scan it, do whatever with it at any particular time. That is very clearly meets the standards for a physical occupation. And I think on that basis, it certainly meets that put together. Now, Your Honor, you also, I think, address this issue of, hey, what are other states doing? That actually was briefed, and I think there is some significant testimony in the record. There are approximately 20 states that, at least on the record in that trial, were discussed that have laws similar to it, I think. And again, this can be additionally briefed if the court wants, although I think, you know, not necessary. But in essence, I think Ohio... ... Oh, I saw when it, I knew when it was, and I stopped within a few seconds. A nanosecond. Yes, I mean, I knew when it happened today because we had the experience yesterday. We don't have any video of her yet. But I think we should... I can hear you, though. Let's go ahead. I believe Mr. Owens had probably about another minute to 90 seconds left. Just go. Go on. You may proceed. Right now. Okay, very good. Your Honors, let me just sort of sum up with two final points, and then I'll answer whatever lingering questions may exist. With regard specifically to, and our First Amendment claims have two parts to them. Essentially, there's the association part, and then essentially the forced speech part. Now, in regard to that, there's this issue of, all right, well, what does AZA and ZAA engage in anyway? And in that regard, it is laid out in our reply brief specific argument on this, but in particular at trial it was deduced a couple things. One, that these organizations did actively be involved in the legislative aspect of this bill. They had paid staff members show up. They actively lobbied for the bill. They actively lobbied for the sort of special carve-out exceptions that they got the benefit of. And, moreover, there was a member of their organization that took the stand and testified that, yes, that is how things are done, and that there was significant data from those organizations of their link with both HSUS, who is, in fact, an intervening party in this, PETA and a number of other organizations, and they have interlocking use of resources. And so in that regard, I think we do lay that out effectively in our reply brief, and I do believe there are significant facts. Lastly, I would leave the court with this. There's been a lot said about, you know, lions and tigers and bears being dangerous, and certainly that's the case. But I think it's noteworthy to note that of the general public in the state of Ohio, there have been more people that have been elected to the office of President of the United States than have been killed or injured severely by any privately owned animal of the plaintiffs that we're talking about. It's really a non-issue, but I'll tell you what it does do. It destroys families, and it is, in certain instances, a death sentence for older animals. And on that basis, we would ask for the relief we've requested. Thank you, Your Honor. Thank you both. Thank you all for your arguments, and we'll consider the case carefully. Thank you.